## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **WILLIAM CRAIG FOSHEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:20-cv-00951-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff William Craig Foshee brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On April 3, 2017, Mr. Foshee protectively filed an application for benefits under Title II of the Act, alleging disability as of March 24, 2016. R. 10, 148-56. Mr. Foshee alleges disability due to difficulties with his back, right elbow, and left shoulder, and numbness/pain in his legs and feet. R. 66, 177. He has at least a high

school education, is able to communicate in English, and has past relevant work experience as a carpenter, sales route driver, and tractor trailer driver. R. 23-24.

The Social Security Administration ("SSA") initially denied Mr. Foshee's application on May 12, 2017. R. 10, 65-82. On May 26, 2017, Mr. Foshee filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 10, 87-88. That request was granted. R. 89-91. Mr. Foshee received a video hearing before ALJ Doug Gabbard, II on February 7, 2019. R. 10, 36-63. On May 6, 2019, ALJ Gabbard issued a decision, finding that Mr. Foshee was not disabled from March 24, 2016 through the date of his decision. R. 10-25. Mr. Foshee was forty-five years old at the time of the ALJ decision. R. 11, 24-25, 66.

Mr. Foshee appealed to the Appeals Council, which denied his request for review on May 27, 2020. R. 1-3, 145-147. After the Appeals Council denied Mr. Foshee's request for review, R. 1-3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On July 6, 2020, Mr. Foshee sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.    The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities."

20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the

ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Mr. Foshee would meet the insured status requirements of the Act through March 31, 2020. R. 11, 13. Next, the ALJ found that Mr. Foshee had not engaged in substantial gainful activity since March 24, 2016, the alleged disability onset date. R. 13. The ALJ decided that Mr. Foshee had the following severe impairments: degenerative disc disease of the back; degenerative joint disease/osteoarthritis of the right elbow; degenerative joint disease of the right shoulder; Morton's neuroma of the left foot plantar metatarsals; and hammertoes. R. 13. The ALJ found that Mr. Foshee's gastroesophageal reflux disease, chronic pain syndrome/post-laminectomy syndrome, rhinitis/sinusitis, otitis, obesity with body mass index above 32.0, vitamin D deficiency, fatigue, essential hypertension, hyperlipidemia, and status/post cholescystectomy were "not severe" impairments as

they "have no more than a minimal effect on an individual's ability to perform basic work activities." R. 13. The ALJ also found that Mr. Foshee's anxiety and depressive/bipolar disorder were not severe because they do "not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." R. 13. The ALJ considered the effects of Mr. Foshee's obesity pursuant to Social Security Rule 02-1p. R. 13. Overall, the ALJ determined that Mr. Foshee did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 15.

The ALJ found that Mr. Foshee's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 16. The ALJ found that Mr. Foshee had the "residual functional capacity to perform light work" with certain limitations. R. 15. The ALJ determined that Mr. Foshee is: limited to standing and or walking four hours in an eight-hour workday; able to sit six hours in an eight-hour workday; able to engage in frequent pushing and pulling with his hands and feet; able to climb ramps and stairs occasionally but never climb ladders, ropes, or scaffolds; able to stoop occasionally but never balance, kneel, crouch, or crawl; able to reach overhead bilaterally occasionally. R. 15. Further, the ALJ determined that Mr. Foshee must: avoid concentrated exposure to extreme temperatures; not drive

motor vehicles as part of his job duties; avoid all exposure to hazards such as open flames, unprotected heights, and dangerous moving machinery; be allowed to alternately sit and stand every twenty to thirty minutes for the purpose of changing positions, but without leaving the workstation. R. 15.

According to the ALJ, Mr. Foshee is "unable to perform any past relevant work," he is "a younger individual," and he has "at least a high school education," as those terms are defined by the regulations. R. 23-24. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 24. Because Mr. Foshee's "ability to perform all or substantially all of the requirements of this level of work" was impeded by additional limitations, the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Mr. Foshee would be capable of performing. R. 24. That expert testified that there are indeed a significant number of such jobs in the national economy, such as a booth cashier and an office helper. R. 24.

Based on these findings, the ALJ concluded that Mr. Foshee did not have a disability as defined in the Act, from March 24, 2016 through the date of the decision. R. 25. Mr. Foshee now challenges that decision.

**III. Factual Record**

The medical records included in the transcript and referenced by Mr. Foshee span many years. However, the period relevant to the Commissioner's disability determination is March 24, 2016 through May 6, 2019. Mr. Foshee has a history of back pain. He underwent back surgeries in 2002 and 2013 "to repair a herniated disc at L5-S1." R. 143, 332-33, 606-09.

Before his first back surgery, Mr. Foshee underwent an MRI of the lumbar spine. R. 618. The impression of the MRI was: "1. Right paracentral disc herniation at L5-S1 encroaching upon the right S1 nerve root. 2. Degenerative changes at L4-5, including an annular tear and associated annular bulge in the posterior midline. 3. Minimal degenerative change at T11-12, with a minimal left paracentral disc bulge." R. 618. Before his second back surgery, Mr. Foshee underwent an MRI of the lumbar spine which showed that "[t]he lumbar spine is in adequate position and alignment. All vertebral bodies are of normal height and show normal marrow signal. There is mild discogenic disease at the L4-5 and more advanced discogenic disease at the L5-S1 level where there is a large centrally herniated disc causing compromise of the neural canal." R. 335, 342-44. After his second back surgery, Mr. Foshee received epidural steroid injections on December 10, 2013 and December 31, 2013. R. 143. Additionally, he was referred for an implant stimulator on March 5, 2014. R. 143.

Mr. Foshee saw Dr. Thomas Kraus at Tennessee Valley Pain Consultants for pain management from December 2013 through December 2018. R. 349-96, 434-

93, 620-24, 628-700, 711-43. In addition to managing Mr. Foshee's pain medications, Dr. Kraus also performed epidural steroid injections and nerve blocks. In addition to the epidural steroid injections after Mr. Foshee's second back surgery, Dr. Kraus also performed epidural steroid injections and/or nerve blocks/nerve epidurographies on October 17, 2016, December 19, 2016, July 31, 2017, August 16, 2017, June 29, 2018, October 5, 2018, and December 26, 2018. R. 357, 361, 418-21, 426-29, 430-33, 711, 714, 729, 741. Dr. Kraus's treating notes are discussed in further detail *infra* Section V.A.

Mr. Foshee fell off his porch on October 24, 2016, resulting in lower back and neck pain. R. 335, 338. After his fall, he underwent a CT of the cervical spine and of the lumbar spine. R. 335-36. The CT showed that "[t]he cervical spine is in good position and alignment, all vertebral bodies of normal height, the disc spaces are preserved[, and] there is no evidence for trauma or degenerative changes." R. 335. The CT also showed that "[t]he lumbar spine is in adequate position and alignment, there is a small nondisplaced fracture of the left side of the superior endplate of L5 . . . of unknown age[, and] the lumbar spine is otherwise unremarkable." R. 336.

A bone scan was performed on January 11, 2017. R. 374. It revealed: "Increased activity in roughly the T12 vertebral body that may be related to a compression fracture but the activity is actually more toward the posterior aspect of

T12. . . . Focally increased activity in the left lower aspect of L1-5/L5-S1 interspace. . . . Mildly increased peri-manubrial activity, probably osteoarthritic." R. 375.

Mr. Foshee presented to CarePlus Family Medical on November 6, 2017, for a yearly physical because he was working part time as a school bus driver. R. 561. The physical examination resulted in "normal" findings with respect to his back/spine, extremities/joints, and gait. R. 559. Mr. Foshee again presented to CarePlus Family Medical on November 6, 2018, for his DOT physical. R. 511. Mr. Foshee noted that he was taking medications for blood pressure, cholesterol, and back pain. R. 514. The medical examiner wrote that Mr. Foshee was "taking all meds as advised [and] no adverse [side effects] noted." R. 515. The physical examination resulted in "normal" findings with respect to his back/spine, extremities/joints, and gait. R. 516.

Mr. Foshee presented to CarePlus Family Medical on May 24, 2018, complaining of back pain after coughing. R. 521. Mr. Foshee received a steroid injection for chronic back pain from CarePlus Family Medical on June 4, 2018. R. 519.

Mr. Foshee has also experienced elbow and shoulder pain and numbness in his legs and feet. R. 143, 170, 397, 406. Mr. Foshee was treated for right elbow pain in 2008 at Premier Orthopedic Surgery. R. 397-402. He returned to Premier Orthopedic Surgery in 2016 for an injury to his left rotator cuff. R. 406-17.

Additionally, Mr. Foshee has been treated for foot pain and hammertoes. R. 777- 78. On June 13, 2017, he reported to Lakeview Family Footcare that his foot pain was "[g]radually getting worse" and that he could not "wear shoe gear or ambulate without pain." R. 777. Mr. Foshee reported pain in weight-bearing and walking. R. 777. X-rays showed no "fracture or dislocations," "[s]light metatarsal adductus noted 2nd and 3rd metatarsals," and "[l]ong 2nd metatarsal." R. 778. Dr. Gerard A. Skaziak recommended orthotics, topical medication, and an injection for pain, and noted that Mr. Foshee was a "[p]ossible surgical candidate . . . should conservative treatments fail." R. 778. Mr. Foshee followed-up at Lakeview Family Footcare on July 11, 2017, reporting that he was "doing better" and that the steroid shot and test padding for orthotics was helping. R. 781. Mr. Foshee reported "almost 90% reduction pain" and that he was "ambulating much better." R. 781. Dr. Skaziak recommended continuing the "conservative treatments" and noted that Mr. Foshee has a "good prognosis." R. 782.

Mr. Foshee returned to Lakeview Family Footcare on November 8, 2017, and he reported that he was experiencing a set back and was experiencing pain "like it was originally." R. 783. At the visit, Mr. Foshee had been more active recently and was "wearing boots again and [they are] not recommended for his type of condition." R. 783. Instead, Dr. Skaziak recommended "sneaker type shoes" and to "[c]ontinue conservative treatments." R. 783-84. Mr. Foshee again returned to Lakeview Family

Footcare on April 9, 2018, when he requested another steroid shot and noted that he could not afford custom molded orthotics. R. 785. Mr. Foshee reported that he could "not ambulate or wear normal shoe gear without pain." R. 785. Dr. Skaziak continued to "[r]ecommend custom orthotics" however he noted that Mr. Foshee "has refused to make [an] effort to obtain them and be casted." R. 786. Dr. Skaziak also recommended, "[s]hould pain persist or not respond to treatment . . . immobilization, physical therapy, orthotics, surgical intervention," but he did not recommend "another steroid shot for at least 4-6 months." R. 786.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the

decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.    Discussion

Mr. Foshee alleges that the ALJ's decision should be reversed and remanded because it was not based on substantial evidence. Doc. 13 at 27. Specifically, Mr. Foshee argues that the ALJ "failed to accord proper weight" to treating physician Dr. Thomas Kraus and failed to show "good cause" for the weight given; the ALJ failed to adequately consider Mr. Foshee's testimony concerning the side effects of

his pain medication; and the ALJ relied on vocational expert testimony that was not based on a correct statement of Mr. Foshee's limitations and impairments. *Id.* at 2, 19-29.

### A. The ALJ's Evaluation of Dr. Thomas Kraus's Medical Opinion

Mr. Foshee first argues that the ALJ erred by not giving the opinion of his treating physician, Dr. Thomas Kraus, proper weight and by failing to show good cause for this evaluation. *Id.* at 19. Mr. Foshee argues that Eleventh Circuit precedent requires an ALJ to defer to a treating physician's opinion. *Id.* at 20-25; *see also* Doc. 15 at 5-7 and Doc. 17.

The SSA has revised the applicable regulations. Historically, the treating source rule provided that a treating physician's opinion was entitled to substantial weight unless good cause is shown to the contrary. *See* 82 Fed. Reg. 5844-01 at 5853 (Jan. 18, 2017); *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (explaining the treating source rule). The SSA formalized the treating source rule in 1991 when it implemented regulations that required ALJs to "give more weight to opinions" from treating sources and to "give good reasons . . . for the weight . . . give[n] [a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2).

The SSA's new regulations promulgated in 2017 do away with the hierarchy of medical opinions and the treating source rule. *Id.* at § 404.1520c(a). Under the new regulations, an ALJ need not "defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s)" for all claims filed on or after March 27, 2017. *Id.* And the ALJ "will articulate in [his] determination or decision how persuasive [he] find[s] all of the medical opinions . . . in [the claimant's] case record." *Id.* at § 404.1520c(b).

When evaluating the persuasiveness of the opinions, the ALJ considers these factors: (1) supportability, i.e., how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)"; (2) consistency with the evidence; (3) relationship with the claimant, including the nature of the relationship, the length of the treatment relationship, the frequency of examinations, and the extent of the treatment relationship; (4) specialization; and (5) "[o]ther factors," such as the medical source's familiarity with the agency's policies and the evidence in the claim. *Id.* at § 404.1520c(c). Supportability and consistency are the most important of the five factors, and an ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions . . . in [his] . . . decision." *Id.* at § 404.1520c(b)(2). The ALJ may explain how he considered the remaining factors, but he is not required to do so. *Id.*

The court will apply the 2017 regulations. Mr. Foshee concedes that he applied for benefits after March 27, 2017. Doc. 13 at 2. Further, the Commissioner has "full power and authority to make rules and regulations" related to the proof and

evidence needed to establish a right to benefits under the Act. *See* 42 U.S.C. § 405(a).

"A court's prior judicial construction of a statute trumps an agency construction . . .

only if the prior court decision holds that its construction follows from the

unambiguous terms of the statute and thus leaves no room for agency discretion."

*Nat'l Cable Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

The Act requires the Commissioner to "make every reasonable effort to obtain

from [an] individual's treating physician . . . all medical evidence, including

diagnostic tests, necessary in order to properly make [a disability] determination,

prior to evaluating medical evidence obtained from any other source on a

consultative basis," 42 U.S.C. §§ 423(d)(5)(B), but the Act does not specify how the

SSA should evaluate treating source evidence. And Mr. Foshee has cited no case in

which the Eleventh Circuit has held that the Act mandated the treating source rule.

Nor has Mr. Foshee argued that the 2017 regulations are arbitrary, capricious, or

otherwise invalid. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S.

837, 845 (1984) (holding that courts must defer to validly adopted regulations).

Accordingly, the court will apply the 2017 regulations – not the treating source rule

– to the ALJ's evaluation of the opinion evidence. *See Matos v. Comm'r*, No. 21-

11764, 2022 WL 97144, at *4 (11th Cir. Jan. 10, 2022) (stating that the "new

regulatory scheme no longer requires the ALJ to either assign more weight to

medical opinions from a claimant's treating source or explain why good cause exists to disregard the treating source's opinion").

Mr. Foshee argues that the ALJ failed to accord proper weight to a March 18, 2016, Physical Capacities Form by one of his treating physicians, Dr. Thomas Kraus. Doc. 13 at 19; *see also* Doc. 17 at 7. In the Physical Capacities Form, Dr. Kraus opined that Mr. Foshee: can "sit upright in a standard chair at one time" for less than thirty minutes; can "stand at one time" for less than thirty minutes; in an eight-hour daytime period, would be expected "to be lying down, sleeping, or sitting with legs propped at waist level or above" for two hours; in an eight-hour work day would be expected "to be off-task" fifty percent of the time; and in a thirty-day period, would be expected "to fail to report to work" ten days. R. 627. Dr. Kraus indicated these limitations have existed since August 28, 2013. R. 627. Dr. Kraus affirmed that Mr. Foshee has: "medically acceptable imaging evidence of nerve root compression"; "limitation of motion of the spine"; and "a positive straight-leg raising test, both sitting and supine." R. 627. Dr. Kraus denied that Mr. Foshee has: "neuro-anatomic distribution of pain"; and "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." R. 627.

The ALJ considered Dr. Kraus's Physical Capacities Form and included in his decision the limitations and findings discussed above, as follows:

> On March 18, 2016, Thomas Kraus, D.O., completed a physical capacities form (Exhibit B15F). Dr. Kraus opined

that the claimant could sit upright in a standard chair for less than thirty minutes. He could stand less than thirty minutes. The claimant could be expected to lie down, sleep, or sit with legs elevated for two hours in an eight-hour workday. The claimant could be expected to [be] off-task 50% of an eight-hour workday. The claimant could be expected to miss work ten days out of thirty. Dr. Kraus opined that the claimant's limitations existed back to August 28, 2013.

R. 23. The ALJ "considered th[is] medical opinion[] . . . in accordance with the requirements of 20 CFR 404.1520c." R. 15. The ALJ assigned Dr. Kraus's opinion "no weight" and found it "inconsistent with his own conservative treatment and with the majority of the evidence in the file." R. 23.

As an initial matter, the ALJ assigned Dr. Kraus's opinion "no weight" instead of "articulat[ing] how persuasive" he found the opinion, as required by the regulations. *See* 20 C.F.R. § 404.1520c(b). Because the decision otherwise referred to and complied with the applicable regulations, the court finds that this error by the ALJ was harmless. *See Sarli v. Berryhill*, 817 F. App'x 916, 919 (11th Cir. 2020) (finding that, under the old regulatory framework, "the ALJ commit[s] harmless error by failing to state the weight it gave to those opinions, as that failure would not have affected the ultimate outcome of the ALJ's decision"). Before his review of Mr. Foshee's medical records, the ALJ specifically stated: "I have also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c." R. 15. Additionally, he stated: "As for

17

medical opinion(s) . . . , we will not defer or give any specific evidentiary weight, including controlling weight, to . . . medical opinion(s), including those from your medical sources." R. 22. The ALJ's statement that he gave Dr. Kraus's opinion "no weight," as well as the reasons given, implies that he did not find it persuasive. Finally, Mr. Foshee does not challenge this aspect of the ALJ's decision. Even after the Commissioner raised this issue in his response brief, Doc. 14 at 24-25, Mr. Foshee made no argument or mention of it in his reply brief. *See* Doc. 15.

Instead, Mr. Foshee argues that Dr. Kraus's opinion "was well supported from treatment records at Tennessee Valley Pain Consultants" and that "[t]he records show treatment by Dr. Kraus from [December 4, 2013] to [January 1, 2017] with at least [twenty] visits not counting hospital visits." Doc. 13 at 20. Additionally, Mr. Foshee argues that Dr. Kraus's opinion "should be accepted" because it "is well supported by clinical and laboratory findings, . . . not inconsistent with other substantial evidence[,] . . . [and] there is no valid basis for rejecting the opinion of the treating physician." *Id.* at 20, 23.

To the extent that Mr. Foshee's statement that "there is no valid basis for rejecting" Dr. Kraus's opinion is an argument based on the treating source rule, that argument fails because the applicable regulations no longer employ that rule. *See* 20 C.F.R. § 404.1520c. As for Mr. Foshee's contention that Dr. Kraus's opinion was well-supported and not inconsistent, the issue before the court is whether substantial

evidence supports the ALJ's decision, not whether evidence may support a contrary decision. *See Martin*, 894 F.2d at 1529. As discussed below, substantial evidence supports the ALJ's finding that Dr. Kraus's opinion was inconsistent with the overall record.

Dr. Kraus treated Mr. Foshee at Tennessee Valley Pain Consultants from December 10, 2013 through December 2018. R. 349-96, 434-93, 620-24, 628-700, 711-41. Dr. Kraus's medical records reflect the following.

On December 10, 2013, Dr. Kraus diagnosed Mr. Foshee with postlaminectomy syndrome of the lumbar region resulting from his most recent back surgery and gave him an epidural steroid injection. R. 620-21. On December 31, 2013, Dr, Kraus performed an epidural steroid injection and prescribed pain medication. R. 623-24.

On January 14, 2016, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of low back pain as well as "joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, [and] arthritis." R. 628-29, 634. He attributed the pain to a work accident that occurred in March 2013. R. 630. On March 10, 2016, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of low back pain and stated that his pain medications were not "very effective." R. 639, 642. Dr. Kraus instructed Mr. Foshee to lose weight and start a regular exercise program. R. 644. On May 12, 2016, Mr. Foshee presented to Tennessee Valley Pain

Consultants complaining of pain in his back and legs as well as numbness in his right leg and feet. R. 647. The nursing note indicates that his pain medication was "effective," and the pain management plan noted that Mr. Foshee was "improving on [the] current plan." R. 649, 652.

On July 7, 2016, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of pain in his low back and legs and numbness in his right foot. R. 654. The nursing note stated that "meds working well with no s.e." and that Mr. Foshee was at the clinic for pain management. R. 658. The pain management plan stated that Mr. Foshee was "improving on [the] current plan." R. 660. On August 10, 2016, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of "low back [pain] down posterior both leg to foot"; "Numbness in feet"; and "Stabbing [a]nd throbbing in back and legs." R. 664. The nursing note states that the pain medication is "effective" and that Mr. Foshee denied side effects. R. 667. Dr. Kraus determined that he "[w]ill not taper and we[a]n any of his medications. Patient gets significant relief and improves function. Continue current medications." R. 668.

On September 21, 2016, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of low back pain and numbness in his feet and legs. R. 675. The nursing note states that the pain medication is "effective" and that Mr. Foshee denied side effects. R. 678. However, the nurse practitioner also noted that workers' compensation would no longer pay for Mr. Foshee's medication, his function

decreased, and he was having shooting pain. R. 678. The nurse practitioner recommended that they approach workers' compensation to get an epidural steroid injection "to help with radicular pain from lower back to legs until we can get the medication issues resolved." R. 679. On October 17, 2016, Dr. Kraus performed an epidural steroid injection. R. 418, 686-87.

On November 16, 2016, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of "[l]ow back [pain] radiating down posterior both legs" as well as "[n]umbness, tingling and aching throbbing [n]eck into left shoulder." R. 349-50. He noted his recent fall from his porch. R. 350-52. The nurse practitioner notes indicate that Mr. Foshee's legs had been giving out more because of medication changed due to workers' compensation issues; "[t]he nerve pain/numbness[,] frequency, duration and intensity has increased[]"; but that "[m]ultiple medical approach to pain allows [Mr. Foshee] to maintain function and emotional well being with pain reduction." R. 352. The nurse practitioner sought to seek approval for an epidural steroid injection, a back brace, and a bone scan. R. 352. The epidural steroid injection was performed on December 19, 2016. R. 361. The bone scan was performed on January 11, 2017. R. 374.

On January 16, 2017, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of pain in his low back and down both legs to his feet. R. 380. The nurse practitioner noted that Mr. Foshee's nerve pain had increased since

he stopped taking Lyrica due to workers' compensation, but that "Percocet helps keep the pain down to a 6/10 for 4 to 6 hrs depending on his activity level." R. 383-84. Additionally, the nurse practitioner noted that the back brace "helps some." R. 384. The nurse practitioner and Dr. Kraus planned to treat Mr. Foshee by continuing current medication, using the back brace, and using the TENS unit. R. 384. Dr. Kraus indicated that Mr. Foshee was "improving on current plan." R. 388.

On April 10, 2017, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of low back pain. R. 389. Mr. Foshee reported that he as "doing well with meds" and that his "pain [wa]s 60% improved." R. 393. Dr. Kraus also noted that Mr. Foshee was "improving on current plan." R. 396.

On June 5, 2017, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of "[l]ow back [pain] radiating into both legs and feet" and that his "[m]id back [was] still painful since he fell and fractured his back in October 2016." R. 434. Mr. Foshee's pain management plan indicated that he was "improving." R. 442.

On July 31, 2017, Dr. Kraus performed a nerve block and an epidural steroid injection. R. 426-29. Dr. Kraus performed a nerve block and an epidural steroid injection on August 16, 2017. R. 430-33.

On October 3, 2017, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of low back pain and numbness in his feet. R. 474. Mr.

Foshee reported that his pain medications were effective and his pain was controlled. R. 478. Mr. Foshee's pain management plan indicated that he was "improving." R. 481.

On November 21, 2017, Mr. Foshee presented to Tennessee Valley Pain Consultants complaining of pain in his lower back, feet, and right leg. R. 484. He "report[ed] pain medication is working well" and that his pain was "well controlled." R. 488. The nurse practitioner discussed pain management with Mr. Foshee, who reported that the epidural steroid injections "provided 70% of relief for several weeks." R. 489. Mr. Foshee's pain management plan indicated that he was "improving." R. 491.

On June 29, 2018, Dr. Kraus performed an epidural steroid injection and nerve root block. R. 711, 714. On October 5, 2018, Dr. Kraus performed an epidural steroid injection. R. 729. On December 26, 2018, Dr. Kraus performed a nerve root block. R. 741.

Under the new regulations, the ALJ adequately accounted for his finding regarding Dr. Kraus's Physical Capacities Form. The ALJ's decision reflects that he considered Dr. Kraus's extensive treatment notes in his analysis. R. 17-19. The ALJ expressly considered each of Mr. Foshee's medical records in chronological order in connection with his opinion about each medical opinion. R. 22-23. Additionally, the ALJ cited other medical evidence in the record that was inconsistent with Dr.

Kraus's Physical Capacities Form. R. 21, 23. For example, the ALJ cited Mr. Foshee's November 6, 2017 and November 6, 2018 physicals that resulted in "normal" findings with respect to his back/spine, extremities/joints, and gait. R. 516, 559.

The ALJ applied the correct legal standards in evaluating Dr. Kraus's opinion, and substantial evidence supports his finding that it was inconsistent with his own treatment records and the medical records as a whole. Mr. Foshee has not shown that the ALJ erred in his consideration of the medical opinion evidence.

## B. The ALJ's Consideration of Medication Side Effects

Mr. Foshee next argues that the ALJ failed to properly consider his subjective testimony about the side effects of his medications. "In determining whether a claimant's impairments limit [his] ability to work, the ALJ considers the claimant's subjective symptoms, which includes the effectiveness and side effects of any medications taken for those symptoms." *Walker v. Comm'r*, 404 F. App'x 362, 366 (11th Cir. 2010).

Under the Eleventh Circuit's two-step "pain standard," a claimant must first present "evidence of an underlying medical condition." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). If he does, the claimant must then either: (a) present "objective medical evidence confirming the severity of the alleged pain," or (b) show "that the objectively determined medical condition can reasonably be expected to

give rise to the claimed pain." *Id.* When an ALJ refuses to credit the claimant's subjective pain testimony, "he must articulate explicit and adequate reasons" for doing so. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). And to fulfill his duty to adequately develop the record, an ALJ may need to elicit testimony and make findings "regarding the effect of [the claimant's] prescribed medications upon [his] ability to work." *See Cowart v. Schweiker*, 662 F.2d 731, 737 (11th Cir. 1981). However, when a claimant did not complain of side effects and the record does not reveal that the claimant's doctors had concerns about side effects, substantial evidence supports an ALJ's determination that medication side effects did not present a significant problem. *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990).

At the hearing before ALJ Gabbard, Mr. Foshee's lawyer inquired into his side effects from medication:

> Q:  The medications that you're taking, do they have any side effects that you have noticed?
>
> A:  Yes.
>
> Q:  What are those?
>
> A:  Stoned. Just, I'm out in la-la-land a lot of times.
>
> Q: Is it hard for you to concentrate when you're taking those?
>
> A:  Yes. I stay angry.

Q: Okay.

A: Depressed.

Q: All right. How long after you take the medication do those symptoms kick in?

A: About 30 minutes.

Q: And how long do they last?

A: Until I wake up.

R. 55-56.

ALJ Gabbard cited this testimony in his decision:

> The claimant testified that side effects to medications cause him to feel "stoned . . . I'm out in la-la land a lot of times", but his doctors noted that he denied side effects to medications (Exhibits B4F/49 and B16F/22-23) and altered mental status (Exhibit B10F/12-13). He testified that he stays angry and depressed . . . . The claimant's testimony regarding his symptoms is largely inconsistent with the information he gave during two DOT evaluations, in which he denied anxiety, depression, nervousness, or other mental health problem . . . . (Exhibit B10F/5 and 48).

R. 23.

The ALJ considered Mr. Foshee's testimony about medication side effects when making his credibility determination. *See* R. 23. The ALJ described Mr. Foshee's testimony in his decision and quoted it directly. R. 23. Indeed, the ALJ found that Mr. Foshee's medical records reflected that he denied medication side

effects and altered mental status. R. 23. Additionally, the ALJ found that Mr. Foshee's DOT evaluations were inconsistent with his hearing testimony. R. 23.

Mr. Foshee does not address the ALJ's factual findings about his medication side effects. *See* Doc. 13 at 25-27; Doc. 15 at 7-9. Nor does Mr. Foshee explain why there is not substantial evidence to support the ALJ's findings. *See id.*

Mr. Foshee's medical records do not show that the ALJ clearly erred when he found that Mr. Foshee denied medication side effects and altered mental status. Treatment notes from Tennessee Valley Pain Consultants repeatedly indicate that Mr. Foshee "denie[d] any side effects to meds." R. 393. *See also* R. 478 ("denies any adverse drug reactions to oral pain meds"); R. 488 ("pain medication is working well, with no adverse s/e noted"); R. 632, 642 ("denies any side effects from medication"); R. 658 ("meds working well with no s.e."); R. 667, 678 ("SE denied . . . Pain medication effective"). Mr. Foshee's June 5, 2017, visit to Tennessee Valley Pain Consultants does suggest that he informed the nurse practitioner that he "cannot take Gabapentin due to nausea/vomiting/hives" but that Lyrica "works." R. 438.

Additionally, because Mr. Foshee complained that Robaxin causes headaches, nausea, and vomiting, it was discontinued. R. 438, 442. Thus, when Mr. Foshee reported side effects, Dr. Kraus made efforts to alleviate them. And, Mr. Foshee was frequently reminded to report medication side effects. At his visits to Tennessee Valley Pain Consultants, Mr. Foshee was advised to "[n]otify [the] office if [he]

experience[d] any adverse reactions or side effects." R. 355, 387, 395, 442, 481, 490, 652, 660, 671, 682.

Further, the record establishes that Mr. Foshee had complained about medication side effects with respect to his cholesterol medication, which was making his face break out. R. 518. Also, Mr. Foshee complained to CarePlus Family Medical on June 2, 2018, that his blood pressure medications were leaving him shaking and lightheaded. R. 520. CarePlus Family Medical advised Mr. Foshee to halve his Amlodipine to see if that helped his symptoms. R. 520.

In Mr. Foshee's November 6, 2018 physical, he stated that he was taking medications for blood pressure, cholesterol, and back pain. R. 514. The medical examiner wrote that Mr. Foshee was "taking all meds as advised [and] no adverse [side effects] noted." R. 515.

Overall, Mr. Foshee's treatment notes do not reflect that his doctors had serious concerns about medication side effects. While Mr. Foshee at times expressed complaints, those complaints do not support the testimony Mr. Foshee gave at his ALJ hearing. The record also reflects that on the occasions when Mr. Foshee made such complaints, his physicians worked to reduce those effects. Therefore, substantial evidence supports the ALJ's decision to discredit Mr. Foshee's testimony about the significance of his medication side effects.

### C. The Vocational Expert's Testimony

Finally, Mr. Foshee argues that the ALJ "relied on the Vocational Expert's testimony that was not based on a correct or full statement of [his] limitations and impairments." Doc. 13 at 27. Specifically, Mr. Foshee alleges that the hypothetical question posed by the ALJ did not accurately state his "pain level or his residual functional capacity." *Id.* This argument fails.

"In order for a Vocational Expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). The hypothetical question posed by the ALJ need not include impairments that the ALJ has properly determined to be unsupported by the evidentiary record. *Crawford v. Comm'r*, 363 F.3d 1155, 1161 (11th Cir. 2004).

After considering the "entire record," the ALJ found that Mr. Foshee has:

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is limited to standing and/or walking four hours in an eight-hour workday. He is able to sit six hours in an eight-hour workday. He is able to engage in frequent pushing and pulling with his hands and feet. He is able to climb ramps and stairs occasionally but never climb ladders, ropes, or scaffolds. He is able to stoop occasionally but he can never balance, kneel, crouch, or crawl. He is able to reach overhead bilaterally occasionally. He must avoid concentrated exposure to extreme temperatures. He must not drive motor vehicles as part of his job duties. He must avoid all exposure to hazards such as open flames, unprotected heights, and dangerous moving machinery. He must be allowed to alternately sit and stand every twenty to thirty minutes throughout the workday for the

purpose of changes positions, but without leaving the
workstation.

R. 15. At the administrative hearing, the ALJ posed a series of hypotheticals to the

Vocational Expert. R. 58-61. This series of questions included hypothetical number

two, which incorporated the residual functional capacity as determined by the ALJ

after his review of the record:

> Q: All right. Let me have you assume, then, a hypothetical
> person who has the same education, and is the same age
> and the same work experience as Mr. Foshee. Can perform
> light work, standing, walking four hours, and sitting about
> six hours in an eight hour work day. Who does frequent
> pushing and pulling with his hands and feet, occasional
> climbing of ramps and stairs, no climbing of ladders,
> ropes, or scaffolds, frequent balancing, occasional
> stooping, kneeling, crouching, and crawling, frequent
> overhead reaching bilaterally. He must avoid concentrated
> exposure to extreme temperatures, he must not drive motor
> vehicles as part of his work duties, he must avoid all
> exposure to hazards such as open flames, unprotected
> heights, and dangerous moving machinery. Could this
> hypothetical person perform Mr. Foshee's past work?
>
> A: No, your honor.
>
> Q: Are there other jobs in the national economy which this
> hypothetical person could perform?
>
> A: Yes, your honor. At a light level, would be a booth
> cashier . . . [and] an office helper . . . .
>
> . . . .
>
> Q: Let me have you assume we have a second hypothetical
> person, the same age, education, work experience as Mr.
> Foshee, who can perform, again, light work, with all same

limitations that I just gave you -- and restrictions that I just gave you for the first hypothetical, but with these differences and additions: this person, instead of being able to do the frequent balancing and occasional stooping, kneeling crouching, and crawling, cannot do any balancing, kneeling, crouching or crawling. No change on the stooping, he can still do occasional stooping. And instead of being able to do frequent reaching overhead bilaterally, this person can only do occasional reaching overhead bilaterally. And in addition, this person must be allowed to alternately sit and stand every 20 to 30 minutes throughout the work day for the purpose of changing positions, but without leaving the work station. Could this hypothetical person find work in the national economy?

A: At [sic] the jobs from hypothetical one would fit without hypothetical two with the sit-stand option . . . .

R. 58-60.

The ALJ included all of Mr. Foshee's residual functional capacity's limitations in the hypothetical he posed to the Vocational Expert. Therefore, the Vocational Expert's testimony was based on a proper statement by the ALJ and constitutes substantial evidence supporting the ALJ's decision.

## VI.    Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 21st day of March, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE